Participation in Document 2-14-1085, Stephen Hipskind v. Nordenstein, Helland's v. Strat's Restaurant Group at Ball, LA. Part of the Royal Deputy of Helland's, Mr. Paul Adams. Part of the Royal Deputy of Howdy, Mr. Donald Muir. Thank you gentlemen for waiting for us. We had a previous oral that was being discussed and time got away. Mr. Adams, if you are ready, you may proceed. Thank you. May it please the Court, my name is Paul Adams and I represent Stephen Nordenstein. It's my pleasure also to introduce my son, Associate Walt Lyon, who's giving me a counsel table today. This Court has a jurisdiction to hear this appeal. Judge Wheaton did not abuse her discretion in making the Rule 304A finding. The claims that the dismissal of which we appeal were finally dismissed in the sense that they were each dismissed with prejudice. I don't think there's a real dispute now that the briefs have been submitted about the finality of those dismissals. Those claims are distinct claims from the claims that Judge Wheaton allowed to go forward in the trial court, despite the fact that they arise out of the same core of operative transactional facts. Well, if in fact, there's a contract here. I think everybody generally agrees with that theory. And if they all, all the two remaining counts, breach of contract and breach of fiduciary duty, this contract is at the core of everything that's been alleged, isn't it? Respectfully, the participants would submit that the defendant's misconduct, the defendant's fraudulent conduct is at the core of everything that's alleged. A source of the legal duties owed by Chicago Title Trust to the Hipskins arises out of that contract. But the other claims that the Hipskins have asserted, their common law fraud claim, their consumer fraud act claim, and their two different conspiracy claims arise out of standards of care and have statutory underpinnings that are different than the contractual basis for the breach of contract claim. It is true that the origin of the fiduciary duty arises in the first instance out of the contract and out of the fiduciary relationship that the contract formed between Chicago Title and the Hipskins. Well, then let me ask it a different way. If, in fact, we decided this 304A appeal, and I think there would be four or so counts involved, how would that help to resolve this entire case? It would, among other ways, necessitate only one jury trial. As matters now stand, if we go back to the trial court without a resolution of the underlying appeal, it is a virtual certainty that we'll be back before this court raising these very same issues after one jury has decided the first trial of the case. Well, isn't it a virtual certainty that if the remaining two counts are against your client, we'll be back here anyway? I don't disagree with that. I think that one of the things that animated Judge Wheaton's decision to enter the 304A finding falls into that fifth guide category of miscellaneous considerations, the economic and judicial kind of considerations. And I think she was properly concerned about the likelihood of having to hold two jury trials and to put 24 jurors through the trouble of hearing this case two times when that is avoidable. It is unlikely, from the Hibskins standpoint, that if the case goes back with all or some of these claims of the underlying appeal reinstated, that the Hibskins will be back here raising the same issues. And that's the test. The test under the third guide or consideration isn't whether there might be a second appeal. It's whether the same issues are likely to be raised in the second appeal. And that is not likely to happen if we go back to the trial court, win or lose, and come back here. Because when we're back here the next time, if that occurs, it would be to raise issues on a developed evidentiary record. We are here today in the underlying appeal asking the court only to consider whether dismissal under 2615 of the dismissed claims was proper at the pleading stage. So the issues that might be raised here in a second appeal, if a second appeal occurs, would be different issues. And that's the test under the guide. It's not whether the case may come back to this court. It's whether the very same issues are likely to come back to this court. And we don't expect that. In fact, we don't see that there's a possibility that that will occur. We do think that even though there isn't a written record of Judge Wheaton's thinking, Guyer doesn't require one. And I can appreciate how appellate courts might be dissatisfied with that particular development of the law, that is that the trial judges don't have to make a record. But the fact of the matter is there is enough in this record to support Judge Wheaton's exercise of her discretion to grant the ruling here. Wasn't there a prior request for a 304A finding by one of the parties in this matter? There was. It was by my clients. And what was the response at that point? The request at that point was denied. Because? Because at that point there were many more parties and many more issues that had not yet been resolved in the trial court. And Judge Wheaton's thinking at the time, it seemed to me, was that no real efficiency would be gained then with all those parties and issues before the court by granting the 304A finding at that point. Because the matter at that point was going to proceed in the trial court as a complicated, morass 304A finding. And in her judgment, there wasn't any judicial economy to be achieved then. But wasn't the basic response to the motion that these are so intertwined that it would be difficult to decide this in a substantive way or a definitive way and not have it? I mean, just, they were too intertwined. And we would have to be making, or she would be asking us to make rulings, you would be asking us to make rulings that we might have to look at again, or you might be foreclosed from bringing because we've already looked at them. That was the Chicago title response. Why isn't it the same now? Because all of the Kravitzky and Hiram tests for a distinct or separate cause of action, the dismissed claims are predicated on different theories of recovery, different doctrines, different statutory bases. And under that case law, including the Kravitzky case from this court, the claims that have been dismissed are sufficiently separate and distinct from those which Judge Wheaton has allowed to go forward. But every single claim that was dismissed and every single claim that remains involves Chicago title and trust, correct? That's correct. How many of the defendants have thus either been dismissed or settled, and I don't want to know which they were, but how many, who's left? All of them. So the only thing left is CT&T? That's correct. And your clients? That's correct. I think to follow on that thought, I think it underscores the care with which Judge Wheaton exercised her discretion in finally granting the 304A finding. She did appear to have thought through carefully the Geier considerations and concluded at a much earlier stage in the case that no real judicial economy would be achieved, whereas after everything else had been cleared from the field, that it would be a more orderly and efficient way to allow what's left of the dispute between the Hibsons and Chicago title to proceed there. Did she say that? That was my question. I'm sorry. I had thought of it. In case we were all going in the same direction. Great minds think alike. My recollection, for whatever that's worth, is that she did say that, or as much as say that, both when she denied the request the first time and when she reconsidered and granted the 304A language later. We don't have a record of that as part of the record on appeal here, but Geier doesn't require that the trial court articulate her reasons, provided that the record supports her having done so. I think we understand that, but you're saying that she obviously considered this. How do we know that if we don't have a record of this current proceedings where she granted the 304A? We have a record of the other one where she denied it, but the mere fact that she grants it this time, are you speculating that she gave it great thought and that she had a reason for doing it and we should take the same reasoning? So what I'm saying is that I'm first of all sharing my recollection of how she rationalized her decisions, both originally denying and then later granting the 304A language. And I think the court can also appreciate how the arguments changed after the case was boiled down to just Chicago title and the Hipskins by looking at the briefs that were submitted when the request was removed. But it is correct that there isn't anything in the record before this court that memorializes what Judge Wheaton's rationale was. We've seen many Judge Wheaton cases and she will often write a lengthy memo that that is incorporated into a record. We don't have that here, do we? You do not. And we don't have a transcript here. That is correct. Nor do we have a bystander's report on this particular hearing. That is correct. Okay. Would you like to say anything about your substantive issues in the time you have left? Just very briefly. I think that the 2615 dismissal issues that are raised in the briefs don't require much additional comment from me and they probably don't normally. It requires only reading the pleading and from our view, that's especially paragraph 14 through 16 of the pleading and then looking at the Lexos and the two Peddinghaus decisions. What I would like to say about the claims for punitive damages, particularly the claim in count 10, the breach of fiduciary duty count that Judge Wheaton has allowed to go forward by having stricken the prior for punitive damages, is that it is the Hipskin's position that she did get that wrong on the corporate complicity and that is the management characterization of Sinekovich where corporate complicity is concerned. Is that involved in either count 8 or count 9? Each of those counts do seek punitive damages and so it would apply to those counts as well. Don't those two counts also involve some of the people who are now out of the case and we'd have to somehow get them back in or have them testify possibly, which is not likely to happen, I would say. They are not involved as parties against whom relief can be, against whom judgments can be entered. They are involved as potential witnesses and involved as parties to the alleged conspiracies. That's a proof issue for a later day and I appreciate the challenges associated with it. And we're hopeful that particularly now that he is out of the case, Maxis is going to be more forthcoming as a witness on those conspiracy claims that he may have been as a party. The point I wanted to make on the management characterization, that version of corporate complicity for purposes of reinstating the prayer for punitive damages, even on just count 10, if that's the only count that goes forward, is that every case that's considered this, including the Epshar case that's cited by Chicago Title and the cases that are discussed and cited in Epshar, are cases that were resolved on an evidentiary record. If you look at our pleading, there is certainly enough here, probably overkill in paragraphs 14, 15, and 16, to conclude that Sienkiewicz's role as a management level employee has been sufficiently alleged. If you read carefully the decisions, the Adams against Zayer decision and the deal against Biford decision that I discussed at length in the Epshar opinion, you'll appreciate that the Pipskins don't have to allege that Sienkiewicz was the CEO of Chicago Title and Trust. It's sufficient that they've alleged that he was a management level employee in that particular office and that he made policy and he exercised discretion with respect to the administration of the Pipskins' escrow. But I guess the issue ultimately is, who was he taking the money from and who was he taking the money for? Are you saying by the mere fact that he was in a managerial position, he was taking that money on behalf of CT&T? The first part of Your Honor's question is easy to answer. He was taking the money from the Pipskins. All the money involved in this case was the Pipskins' money. Based upon the facts that we've alleged and inferences at least that we believe follow from them. And they should be reasonable inferences. Reasonable inferences. Sienkiewicz was taking the money for himself. For Matzos, for various of these other trades and materials suppliers who in some instances did, in some instances never did any work on the Pipskin project. But who disbursed the Pipskins' money for it. And it doesn't matter under this management version of corporate complicity that Sienkiewicz wasn't taking the money for Chicago Title. It matters that Chicago Title put Sienkiewicz in this management position and caught him with the authority to take the money from the Pipskins. So part of his employment was that he could take money from escrowees and do whatever he wanted with it. He had that deal with Chicago Title and Trust. I mean that's a reasonable inference. It sounds like you might be, I'm sorry, that's not a reasonable one. That's an inference that could be drawn. Sienkiewicz, as we've alleged in the pleading, was the last sign-off on all the disbursements from the escrow. So the answer to that question is yes. That's the position in which Chicago Title and Trust put him. And in this case we've alleged that he did it by forging the Pipskins' signatures, by forging Matzos' signature, by changing numbers on the documents. And we've done that in the pleading in painstaking detail to the extent we've been able to determine it based upon our own analysis of the documents without the benefit of a document examiner or a forensic accountant. Those things may well have happened, but the issue is what is Chicago Title and Trust's responsibility for them? Was he acting on behalf of his employer when he misappropriated those funds? And the on-the-surface answer is yes, he was their employee. But did he do these things in derogation of his responsibility to CT&T or because of his responsibility to CT&T? Under this management prong of corporate complicity, respectfully, it doesn't matter whether he did it for Chicago Title or in derogation of his interest. It matters that he did it because he was put into a position by Chicago Title and Trust and cloaked with the authority to do those things. So you're saying because he had the opportunity, because they hired him in this position, that's enough? The cases that have addressed this management component of corporate complicity, and there are four different versions under the Metz-Gay-Espy case. The fourth being the management-level employee. There's not a ratification that he's not responding as superior in the conventional sense. It's almost an apparent agency argument. In fact, in the EF-SHARP opinion, the language borrows from apparent agency. They cloaked him with this authority. We allege, among other things, that the escrow agreement told the Hipskins, this is the person at Chicago Title and Trust that you have to deal with. But you said they cloaked him with this authority. This authority to do what? To administer the escrow, including make disbursements from the escrow, to sign off on the disbursements from the escrow. The Chicago Title, by virtue of putting him in this position... In whatever manner he chose. Yes, is the answer to that question. If you look carefully at the cases that define the parameters of this fourth component of corporate complicity for purposes of claims for punitive damages against employers, if the employer puts Sienkiewicz into this position, they gave him the authority, he made policy at that branch, he was the one who controlled the disbursements, that is enough under that component of corporate complicity to impose liability for punitive damages on Chicago Title. I think Justice Spence has a question. Isn't some conduct, though, by its very nature, so far removed from the scope of employment that it's obvious that the actor, the employee, was acting for himself and not for the employer? Not according to these cases, under this component of corporate complicity. For example, the Abshok case is a case where a loan solicitor, a fellow who sold loans for a lender, represented that a loan had been approved when in fact it never had been. There's no way you can view his conduct in that case as having been for the benefit of the lender. Nevertheless, there, on the facts alleged, he could have fallen in this management level of employment for his employer to have been held liable for punitive damages under that variation of corporate complicity. Was he stealing the money in that case? I think it's not evident that there was ever money to steal. He represented to the plaintiff that the loans had been approved, and that caused the plaintiff in that case to make commitments that the plaintiff then couldn't see through because he didn't have the financing. So it's a little different kettle of fish, on the facts. You will have an opportunity for rebuttal, if you ask, and we will proceed then with your opponent. Thank you. Mr. Neerling? May it please the Court, Donald Neerling, Cork, Chicago-Taiwan Trust Company. Some more agreement than I thought because one thing is clear from the comments just made by appellants, and that is that we're going to be back here a second time, and that should give everyone pause, and it should cast some real questions on whether we're here today properly. And the fact is that we are not, because despite the talk about judicial autonomy and various other grounds that might justify being here, we first have to get past step number one, and that's whether there's a separate distinct claim here to be resolved. And the fact is there is not. Well, they're called separate. They're called different things, and there are different theories of recovery, I suppose. But what do they all rely on, if anything? They all rely on 21 pages of factual allegations that are then incorporated by reference into the, I think it's 11 different counts, but, and with respect to each of those separate counts, to the extent there is anything new added to the count, it's simply a conclusory allegation to the effect of these 21 pages of allegations demonstrate that this is fraud or whatever the claim for relief is, but the underlying factual allegations are the same for everything incorporated by reference. And I think the case law is pretty clear that we have to find a separate claim and not a separate count and not a separate cause of action. And in fact, Rule 304A doesn't mention causes of action, and it doesn't mention counts of a complaint. It talks about claims. Doesn't it also talk about resolving claims of a party in conclusion, and we still have just those two parties left? Or if it doesn't specifically say that, doesn't it imply that we're resolving as to somebody and they can go over here? Exactly. It talks about the full resolution of claims between parties, and when it begins talking about multiple parties, it uses a slightly different language, I think, but as between the same parties, the only word used is claims. And so we need to find a separate, distinct claim here. Certainly it is not the rule, or at least it should not be the rule, I don't believe it is, that I can manipulate the jurisdiction of this court by simply taking my one claim and calling it count one and count two and count three and whatever it is and parsing it up the way that I want it in order to manipulate a public jurisdiction. That's clearly not the case. It has to be a standalone claim. We have actually gone back and cited some res judicata, a res judicata decision on this issue, which I think is helpful. Appellants take issue with it. They say it has no place here. But in fact, in 1955, when the Supreme Court drafted the predecessor to Rule 304A, I think claim had a pretty well-established definition, and a big part of that definition came out of res judicata law, or as it was probably referred to back then, claim-splitting law. And there was a concept of what a claim was back then, and it should be one today. So we do not have a separate, distinct claim here. Even if there were a separate, distinct claim in terms of the judicial economy and the efficiency, what's really at stake here? There's approximately $35,000 that disappeared out of this escrow account in ways it should not have. That's undisputed. It's not disputed that Mr. Sinekovic is responsible for that. What's really at stake here is whether or not there's $630,000 worth of damage that arose from that $35,000 disappearance. That is an issue that's going to get – that's where the bulk of the labor will be done in the trial court, if it's not disposed of on a summary judgment, but at least the discovery will be done there. And that's the issue that's going to be back in front of this court on the second go-around. It's not going to be issues about what Mr. Sinekovic did or whether his conduct was fraudulent. It's going to be what were the damages. And, in fact, appellants make this point themselves, I think, both in – at least in their 304A response, response to the 304A motion, and perhaps in the merits brief as well, I forget. But their point is that the valuable claims have been dismissed and only these rather remedial claims have been left behind. In fact, there's no authority cited for that. There's no suggestion as to why these other claims are more valuable. It's $35,000 of damages. That's the end of the discussion. By striking the issues of punitive damages, has Judge Wheaton – what you're saying is Judge Wheaton has impacted or has denied that $634,000 or she's limited it somehow? The $634,000 that's being claimed is not punitive damages. The contention is that somehow as a result of these $35,000 in improperly documented disbursements, there was $634,000 of construction defects in this new project. I think in terms of the contract, we're not responsible for that. But beyond that, there are obviously some serious causation problems with suggesting that $35,000 in misappropriated funds, all of which were replaced, somehow caused this $600,000 plus of construction defects. Now, certainly Chicago Title says it was all replaced. Does your opponent admit that they were replaced or is that still a source of issue as well? The – Well, let's put it this way. As part of the 304A proceedings of the second go-around, by that point, the $35,000 had been – we wrote a check to the Hipskins for that amount. I think they would dispute – and that's part of the record down there. They never disputed that. They would dispute that $35,000 fully compensates them because their contention is they need $600,000 plus, but there's no dispute. And I'm sure that my colleague will tell you otherwise, but there's no dispute that $35,000 hasn't been paid. As to the merits, if I can turn to that just very briefly, I think the Court has already hit on a couple of key points there. I mean, Mr. Sinekovic did not steal anything from the Hipskins as a practical matter. He stole it from Chicago Title and Trust because they are the ones who are on the hook for the money. He didn't – you know, all of this money goes into an escrow account. It's not – nobody has a serial number of the money that went in or it's not an identifiable channel or anything like that. It goes in an escrow account. Chicago Title is liable for it. Mr. Sinekovic paid onto his friend or himself or whatever happened to it. But it certainly was not – I think the question was posed. That money was not paid to Chicago Title. It was not taken for the benefit of Chicago Title. It was not given to Chicago Title. Chicago Title is facing liability on that. So he was clearly not acting on this corporate employment. What about this corporate complicity? By giving him this position, you allowed him to do this essentially. But the corporate complicity document does not override the rule that he – that CTT is liable only for conduct that was intended to further CTT's interest. You know, I go back to a comment that was made here. There is some conduct that just clearly is not within the interest of the employer. Stealing in a way that puts the employer – that subjects the employer to contractual liability certainly is not within the interest of the employer. You know, we cited the Deloney case. I mean, I don't care what your theories about education are of sexual assault, but a student clearly is not in furtherance of the interest of the employer. And there's some kinds of conduct that are just too out there, and this is it. And that corporate complicity really doesn't override that rule or have anything to do with it, really. Would it include – would this corporate complicity include negligent hiring, or is that – that is a separate issue of itself. Would it in any way fall under this? There has never been an allegation of negligent hiring or negligent supervision or anything else. Would that fall under the corporate complicity? Well, if it's never been argued under this, then I'm not going to ask you to speculate. I just – because we don't have a total record of this 304A, Mr. Adams gave us – or attempted to give us his recollection. I wondered if you had a recollection, and I think you said you don't recall it being argued. No, I – there was never any argument concerning negligent hiring or negligent supervision, that kind of thing. It was strictly – they put him in this position. And, again, this is – there may not be some complaint. The allegations are that he was placed in this position, and because of his position, he was able to control the flow of funds, basically, is the argument. Again, I think just to address one question I believe was raised, I mean, he clearly was not authorized to disburse funds in this way for whatever means he might have wanted to do so. He was, of course, limited to disbursing them in a way that was consistent with the agreements of Chicago title and his duties to Chicago title. I don't believe I – with that, I would waive the rest of my time, because I believe I've addressed everything I need to, unless the court would like – would have questions. No, thank you very much, sir. Thank you. Mr. Anderson. Thank you again. I'll move kind of quickly through these comments. The basis for vicarious liability of Chicago title under this fraud by agency theory that's established and lets us in the Peddinghaus cases shouldn't be confused with the managerial position kind of version of corporate complicity that supports the claim for punitive damages. Under less so in the Peddinghaus decisions, fraud by agency for which the employer can be held vicariously liable is established where the principal, Chicago title here, is liable for the deceit of its agent. If the deceit is committed in the very business the agent was appointed to carry out, even where the agent's specific conduct was carried out without the knowledge of the principal, and the theory applies where the principal puts the agent in, and I'm quoting now from the Lutz's decision, quote, a position which enables the agent, while apparently acting within his authority, to commit fraud upon third persons, and that's the basis for Chicago title's responding at superior liability in this case. Is he even apparently, though, acting within the scope of his authority? To the Hipskins, and that's the view that Lutz has taken. To anybody, the fact that he's misappropriating the funds, how can you say that that is apparently within the scope of his authority? So in Lutz's, for example, the court held that this fraud by agency theory had been sufficiently alleged and supported where the realtor had purchased a property from the seller who hired the agency, and then right away flipped it to another buyer for the agent's own personal profit and gain. The court there sustained the original seller's claim against the real estate agency because the agency had put the real estate agent in a position that appeared to the original seller of the property to have their authority. That wasn't a criminal act, though, right? It might have been unethical, but was it criminal? It was a fraud. It was criminal in that sense. Well, there can be civil fraud. There can be criminal fraud. And the decisions speak to fraud, and I don't think it matters whether it's criminal or civil. And in our case, we're dealing with fraud that happened to have been both. Where the management characterization of Sinikovitch is concerned, it also doesn't matter whether Sinikovitch is operating for the benefit of Chicago title. Absher is interesting because Absher allowed a claim for punitives to go forward at the pleading stage and then reversed the award of punitives after trial because the loan seller turned out not to have all the authority that he was alleged to have had in the pleading. He turned out to be just a seller, not a management-level employee. And the discussion in that case makes clear that he had the framework for now analyzing the issue of whether an employee is a management employee. We have certainly alleged enough here under Count Tan and the other claims for punitive damages on that management problem of complicity. I'd answer a couple of questions now that have been raised in counsel's remarks. The $634,000 in damages about each arrest are important to the Hipskins and underscore the separate and distinct nature of the claims that were dismissed for 3048 purposes because those are tort damages, not contract damages. And that is a reason why the claims under those dismissed counts are separate and distinct theories. Those are tort theories of recovery. But without the contract, knowing what the contract terms were and the way it, in your theory, was manipulated, we couldn't get to the tort, could we? That's where the relationship begins. There's no question of that. But every case that has looked at, in every case in which an appellate court has exercised jurisdiction under Rule 304A involved fact patterns that were all the separate and distinct claims arose out of the same core of facts. And the Heinrich and Kravitzky decisions address Your Honor's concern specifically where it says, where those cases say even when a single claim is presented several ways in multiple counts, a judgment on one count is appealable under 304A when the basis of recovery in each count is different and because the distinct causes of action have been disposed of. And it goes on to talk about when they're distinct and says that when the grounds for discovery under the various counts derive from different statutes or common law doctrines or when various theories of recovery require different elements of proof, a proper claim or involve different standards of conduct that would bar recovery. The dismissed claims here are, in that sense, separate and distinct claims from the claims that Judge Newton has allowed to go forward. She carefully exercised her discretion in handling the 304A finding. The Hitchcombs respectfully request that Your Honors consider their appeal and that you reverse the dismissal of the counts and appellate damages. Thank you. Thank you very much, both counsel and colleague. We appreciate your argument this morning and we will issue a decision in due course. We will stand in recess now to prepare for another hearing. Thank you.